**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

In re:
ESTATE OF BRIDGET
WASHINGTON,
etc., et al.,

      Plaintiffs,

v.                                                    Case No. 3:10-cv-1136-J-32PDB

CARTER'S RETAIL, INC.,

      Defendant.

_____

<u>**O R D E R**</u>

    This case is before the Court on three pending motions:   Carter's Retail, Inc.'s

("Carter's") Motion for Summary Judgment as to the Estate of Bridget Washington

(Doc. 79), Carter's Motion for Summary Judgment as to plaintiff Catherine Harrington

(Doc. 80), and Carter's Motion for Rule 11 Sanctions (Doc. 91).   The Court has

reviewed and considered the parties' submissions regarding these motions, as well as

relevant portions of the record.   The Court heard oral argument on the motions on

June 2, 2014 and incorporates the record of the hearing by reference.

## I.    BACKGROUND

    This suit involves allegations against Carter's under the Fair Labor Standards

Act ("FLSA"), 28 U.S.C. § 201 <u>et</u> <u>seq</u>. and the Family and Medical Leave Act ("FMLA"),

29 U.S.C. § 2601 <u>et</u> <u>seq</u>. by the Estate of Bridget Washington ("Washington")[1] and

_____

    [1] Sadly, Bridget Washington died from an advanced stage of breast cancer on

Catherine Harrington ("Harrington").   Because the Estate is bringing this claim, there is little evidence from Washington herself, and therefore the Court relies heavily on the testimony of plaintiff Harrington as to the allegations of the FLSA claim.[2]

Carter's hired Washington to be the store manager at its St. Augustine location ("Store 87") on March 20, 2000 (Doc. 24 at 6), and Carter's hired Harrington to be a part-time retail associate on April 24, 2007.[3]   Id.   Carter's later promoted Harrington to a part-time supervisor on or around September 10, 2007.   Id.   As of 2007, both plaintiffs were hourly employees, with Washington making $17.48 per hour, and Harrington making $8.58 per hour.   Id.   Carter's concedes that plaintiffs are not exempt from the FLSA's overtime requirements.

Washington and Harrington's FLSA claims stem from allegedly being forced to work off the clock hours without pay, in order to manage the store adequately.   Doc. 90-3 (Harrington Dep.) at Tr. 11.   Washington alleges Carter's violated the FLSA by

---

October 22, 2010, less than two months before this complaint was filed.   (Doc. 24 at 3).   This cause of action survives her death and her named personal representative, Robert Lewis Washington, Jr., has standing to sue.   Unless specifically stated otherwise, Bridget Washington, the Estate of Bridge Washington, and Robert Lewis Washington, Jr., in his capacity as personal representative of the estate, are used interchangeably as "Washington."

[2] Catherine Harrington's videotaped deposition from December 13, 2011 and March 15, 2012 is scattered throughout the record in excerpts as follows:   Doc. 50-5, 50-6, 65-14, 79-8, 79-9, 80-6, 80-7, 89-1, and 90-3.

[3] Harrington testified that Carter's hired her as a sales associate in April 2007, then promoted her to a part-time supervisor on or around September 2007.   See Doc. 80-6 (Harrington Dep.) at Tr. 25, 26-28.   As a part-time supervisor or "key holder" Harrington worked around "20 to 24 hours."   Id. at 27.   In 2008, Harrington was unable to work more than 20 hours and resigned her position as a key holder.   Id. Since the commencement of this lawsuit Harrington has been promoted to acting assistant manager of Store 87.   Id. at 28.

failing to compensate her for the work performed off the clock in excess of forty-hours per week, and then retaliated against her when she complained.   (Doc. 24 at 13). Harrington alleges that Carter's violated the FLSA when the number of hours she worked off the clock from June 2007 to November 2008, pushed her hourly rate below the federal minimum wage standard.   Doc. 90-3 (Harrington Dep.) at Tr. 104; (Doc. 24 at 11-12).   Furthermore, Washington alleged Carter's violated her rights under the FMLA when she requested multiple days off for medical treatment and Carter's refused.

A.   FLSA

Plaintiffs claim the alleged FLSA violation stems from "unrealistic expectations by the district manager," and Washington's direct supervisor, Jessie Cunningham ("Cunningham").   Doc. 90-3 (Harrington Dep.) at Tr. 11.   Plaintiffs allege Cunningham forced them to get work done off the clock because she would not authorize overtime.   See id.   Plaintiffs claim the low payroll hours budgeted to the store through Cunningham, as well as high associate turnover, and "unsafe" closing practices forced them to clock out, but continue working.   See id. at Tr. 11, 95. Washington and Harrington would sometimes work before clocking in, or work after clocking out, to complete the necessary tasks still needed to be done.   See id. Harrington claims that the uncompensated work included times she stayed "afterward and worked off the clock to either protect another coworker or to clean the store or to talk to the next manager coming in or supervisor coming in to explain what we were doing and what was going on."   Id. at Tr. 95.   Washington would sometimes work

from home without recording her time.   Doc. 79-12 (Doretha Washington Dep.) at Tr. 64.   Washington's mother testified that it was the only way her daughter could get the job done.   Id.   Plaintiffs allege that attempts to have Cunningham, the regional supervisor, increase the payroll budget to alleviate the off the clock work never happened, and that instead Cunningham would cut hours.   Doc. 90-3 (Harrington Dep.) at Tr. 9.   Harrington said Washington complained to others in management including Annette Metzger and Chris Ausberger about needing more staff hours.   Id. at Tr. 147.   However, Washington never complained to anyone in management about any of the off the clock work that was happening as a result of low payroll hours.   Id. at Tr. 149.   In fact, Harrington testified that neither she nor Washington ever complained to anyone in upper management about working off the clock because working off the clock "was against company policy."   Dep. 79-8 (Harrington Dep.) at Tr. 144.

The only notice that Carter's had about the off the clock work was a self-report made by Harrington.   Harrington said she notified Cunningham about staying to protect an employee scheduled to close alone.   Doc. 80-6 (Harrington Dep.) at Tr. 122. Harrington claims her purpose in reporting her own violation of Carter's timekeeping policy was to influence Cunningham to budget more employee payroll hours for the store and said that Washington knew what she was doing.   Doc. 80-6 (Harrington Dep.) at Tr. 159.   Harrington never "wanted pay" to stay with an employee closing alone, but wanted "HR to realize that it is an unsafe practice to do that."   Doc. 90-3 (Harrington Dep.) at Tr. 158-59.   Following this report to Cunningham,

Washington—as the store manager—disciplined Harrington for violating Carter's timekeeping policy.   Doc. 80-6 (Harrington Dep.) at Tr. 159.

Carter's "clearly communicated" its timekeeping policy to both Washington and Harrington.   The policy prohibited off the clock work.   Doc. 90-3 (Harrington Dep.) at Tr. 90.   Plaintiffs further knew that if they did not follow the timekeeping policy, that it "could end . . . in termination."   Doc. 90-3 (Harrington Dep.) at Tr. 90. Although at times Store 87's computer system would not allow employees to clock in or out, Washington and Harrington were able to manually enter store associates' time, and all records were "absolutely" accurate.   Doc. 90-3 (Harrington Dep.) at Tr. 92-93. Cunningham never told any employee at Store 87 that they must clock out by 9:30 p.m.   Doc. 90-3 (Harrington Dep.) at Tr. 96.   However, Washington did tell Harrington, "[i]n a store meeting" that it was the store's policy to clock out at 9:30 p.m. Doc. 90-3 (Harrington Dep.) at Tr. 97.   Harrington concedes that "no one ever told [her] to work off the clock," including Washington.   Doc. 90-3 (Harrington Dep.) at Tr. 98.

In September 2008, a former assistant manager at Store 87 raised concerns with Cunningham about employees being "told to work off the clock."   Doc. 60-6 (Gaby Dep.) at Tr. 255.   Subsequently Cunningham pulled the alarm report and time sheets to "perform[] an audit of Bridget Washington's timekeeping practices."   Doc. 79-6 (Gaby Decl.) ¶ 12; Doc. 60-6 (Gaby Dep.) at Tr. 255-57.   The audit revealed that Washington was working off the clock, and she "sometimes waited hours to clock in . . . . sometimes leaving the store without clocking out."   Doc. 79-6 (Gaby Decl.) ¶ 12.

"Ms. Washington was suspended pending further investigation on December 5, 2008."

Doc. 79-6 (Gaby Decl.) ¶ 13.   Carter's officially terminated Washington's employment

on December 12, 2008.   Id.   Washington claims Carter's terminated her employment

in retaliation for complaining to management about not being paid overtime wages.

(Doc. 24 at 13).   However, at no time did Washington ever complain to any manager

at Carter's about working off the clock.   Doc. 90-3 (Harrington Dep.) at Tr. 144.

     B.  FMLA

Washington alleges Carter's violated her right under the FMLA when

Cunningham denied Washington's request to take time off for medical reasons.   (Doc.

24 at 14-16).   Washington requested to take time off in September 2007, but never

told Cunningham that the purpose of the request was for a medical procedure.   Doc.

79-12 (D. Washington Dep.) at Tr. 29.   Washington's mother testified that it "was

none of her [Cunningham's] business" why Washington requested the leave, and her

daughter did not "have to explain to [Cunningham] what she was taking off for."   Id.

Washington "figured if she took the vacation time, you didn't have to - - she didn't have

to explain all of that to her [Cunningham]." Id.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate where "there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law."

Fed.R.Civ.P. 56(a).   "An issue of fact is 'material' if, under the applicable substantive

law, it might affect the outcome of the case.   An issue of fact is 'genuine' if the record

taken as a whole could lead a rational trier of fact to find for the nonmoving party."

Harrison v. Culliver, 746 F.3d 1288, 1298 (11th Cir. 2014) (citation omitted). Carter's, as the moving party, bears the initial burden of establishing the absence of a genuine issue of material fact.   Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). Once the moving party has met its initial burden, the burden shifts to the non-moving party to identify facts that show a genuine issue for trial.   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1968).   Summary judgment should not be granted if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party."   Id.   Only disputes over facts that might affect the outcome of a suit will preclude the entry of summary judgment.   Id.

## III.   FLSA CLAIMS

The FLSA directs that "[e]xcept as otherwise provided . . . , no employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."   29 U.S.C. § 207(a)(1).

### A. Statute of Limitations

An action commenced under the FLSA has a two-year statute of limitations, unless the action "aris[es] out of a willful violation."   29 U.S.C. § 255(a).   Plaintiffs can "obtain the benefit of a 3-year" statute of limitations by proving that "the employer's conduct was willful."   McLaughlin v. Richland Shoe Co., 486 U.S. 128, 135 (1988).

Courts have held that a cause of action under FLSA accrues "when the employer fails to pay the required compensation for any workweek at the regular pay day for the period in which the workweek ends." 29 C.F.R. § 790.21(b).   "Because each violation gives rise to a new cause of action, each failure to pay overtime begins a new statute of limitations period as to that particular event." Knight v Columbus, Ga., 19 F. 3d 579, 582 (11th Cir. 1994).

Under 29 U.S.C § 256, an action is commenced for purposes of an FLSA claim on the date the named plaintiff files the complaint.   However, collective actions fall into an exception to the general rule.   29 U.S.C. § 256(a)-(b).   If the collective action names an additional "party plaintiff" in the complaint and she files a written consent on the date the complaint is filed, the action is also considered to be commenced on that date vis-à-vis the additional plaintiff.   29 U.S.C. § 256(a).   However, if the additional plaintiff's name does not appear in the complaint and written consent is not filed, the subsequent date on which the additional plaintiff filed the consent will be the date the action is deemed to have been commenced as to that plaintiff.   29 U.S.C. § 256(b).

The parties disagree both over whether plaintiffs commenced this action within the two-year statute of limitations and whether the three-year statute of limitations applies.   Before taking up the issue of whether Carter's alleged conduct amounted to a willful violation—entitling plaintiffs to an additional year to file—this Court must determine the date the cause of actions accrued as well as the date the action commenced for plaintiffs Washington and Harrington respectively.

1. Washington

Under 29 U.S.C. § 256, the date of commencement for this action is the date Washington filed the original complaint on December 13, 2010.   (Doc. 1).   To bring a claim for a non-willful violation of the FLSA, the cause of action must have accrued no earlier than December 13, 2008.   29 U.S.C. § 255(a).   Washington maintains that the FLSA claims are within the statute of limitations because she filed her complaint on December 13, 2010 and continued to receive wages after December 13, 2008.   (Doc. 96-2, Doc. 101-3).[4]   Carter's maintains that because it suspended and terminated Washington prior to December 13, 2008, it is impossible that she accrued any uncompensated overtime because she was no longer working at that time.   (Doc. 79 at 8, n.4).[5]

Unfortunately, the only person with personal knowledge of distinct dates and times of the alleged off the clock work is Washington, and she is no longer alive.[6]

---

[4] Washington's employee earnings record shows the final paycheck was to be paid on January 9, 2009.   (Doc. 101-3 at 2, cf. Doc. 90-10 (showing Washington's final paycheck was deposited into her account on January 8, 2009)).

[5] Kirkland-Brown v. Amelia Island Care Ctr., No. 3:10-CV-1000-HES-MCR, 2012 WL 2178854, at *2 (M.D. Fla. June 13, 2012).

> The date of an employee's termination is irrelevant to the limitations period applicable to FLSA claims alleging a failure to pay overtime wages; the relevant event triggering the limitations period is instead the date on which an employee received the paycheck that he alleges failed to incorporate the overtime wages he was due.

Id.

[6] The handwritten notes Washington prepared prior to her death are absent of any dates of uncompensated overtime worked.   The notes speak only to "the lack of

However, the Court has viewed the evidence in the light most favorable to Washington, and has relied on facts distilled and supported by the record, including Washington's employment earnings record and testimony regarding her suspension date.   See (Doc. 101-3); Doc. 79-6 (Gaby Decl.) ¶ 13.

The record reveals the following:   the pay period for work Washington performed on or before December 5, 2008 ended on December 6, 2008.   See Doc. 101-3 (Washington Earnings Records).   Because Washington was an hourly employee, any work she performed up to her suspension would have been paid the following Friday, December 12, 2008.   Id.   If Carter's failed to pay Washington any overtime for hours worked during the final week of her employment, the cause of action would have accrued on the date when she normally would have been paid; that date is December 12, 2008.   See 29 C.F.R. § 790.21(b); Knight v Columbus, Ga., 19 F. 3d 579, 582 (11th Cir. 1994).   Washington's position that she received a final paycheck on January 9, 2009, thus triggering the statute of limitations on that date, is without merit because Washington never worked past the December 12, 2008 pay period.[7] Washington's earnings record show that Washington never reported any regular hours

---

adequate hours issued to the store" and "working off the clock, to talk to the incoming supervisor" without any dates or how many hours or times supervisors worked off the clock.   (Doc. 79-2).

   [7] Washington did receive two final paychecks following her termination on December 26, 2008 and January 9, 2009.   Doc. 101-3 (Washington Earnings Record). Although unclear, it is likely that Washington received these final checks to compensate her for something other than hours worked, such as unused vacation or sick time.

or overtime hours following December 6, 2008.   Doc. 101-3 (Washington Earnings Record).

Thus, even viewing the evidence in light most favorable to Washington, the actual accrual date for Washington's FLSA claim could have been no later than December 12, 2008.   Albeit by one day, she filed this lawsuit late too late to meet the two-year statute of limitations.   Unless Washington shows sufficient evidence that Carter's willfully violated the FLSA, any FLSA claim under 29 U.S.C. § 255(a) is time-barred.

2.   Harrington

While Washington filed the original complaint on December 13, 2010, the complaint did not mention Harrington, nor did it contain a consent form with her signature.   (Doc. 1).   On March 23, 2011, Harrington filed a consent to join the lawsuit, however the document did not include Harrington's signature.   (Doc. 18).   It was not until March 28, 2011 that Harrington filed a signed consent form.   (Doc. 19).   Subsequently on May 10, 2011, plaintiff filed a motion to amend the complaint to add Harrington as an individual plaintiff and withdraw the count asserting a collective action.   (Doc. 24).   The Court granted that motion and deemed the Amended Complaint (Doc. 24) to be filed as of the date of the Order, on July 13, 2011.   (Doc. 30).

Harrington alleged she worked off the clock hours through November 2008. Doc. 80-6 (Harrington Dep.) at Tr. 107.   Viewing the evidence in the light most favorable to Harrington, the last possible date she could have worked those off the clock hours was November 30, 2008.   Using the pay end and pay dates on Carter's

employee earning record, the hours worked November 23 to December 6, 2008 were paid on December 12, 2008.   Doc. 101-3 (Washington Earnings Records).   Therefore any payment that Carter's failed to pay Harrington for her hourly work done on or up to November 30, 2008 would have also been paid on December 12, 2008.   Id. Regardless of whether this Court uses the date of filing the consent or the date of the amended complaint, both are outside the statute of limitations which expired on December 12, 2010.[8]   Absent a showing that Carter's conduct willfully violated the FLSA under 29 U.S.C. § 256, Harrington's claim is time-barred.

## B. Willful Violation

A "cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued."   29 U.S.C. § 255(a).   "To establish that the violation of the Act was willful . . . the employee must prove by a preponderance of the evidence that his employer either knew that its conduct was prohibited by the statute or showed reckless disregard about whether it was."   Reynolds v. City of Jacksonville, No. 308-CV-388-J-32HTS, 2009 WL 5067799, at *7 (M.D. Fla. 2009) (citing McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133 (1988)).   The Code of Federal Regulations defines reckless disregard as the "failure to make adequate inquiry into whether conduct is in compliance with the Act."   5 C.F.R. § 551.104.   "An employer knowingly violates the Act if he disregards the minimum wage laws deliberately or intentionally . . . ."   Davila v. Menendez, 717 F.3d 119, 1185 (11th Cir.

---

[8] Even if the Court were to calculate the statute based on the original complaint date of December 13, 2010, Harrington would still be outside of the statute of limitations which lapsed on December 12, 2010.

2013) (citing McLaughlin, 486 U.S. at 133).  "In other words, an employer does not commit a willful violation if he acts unreasonably, but not recklessly, in determining his legal obligation under the Act."  Davila, 717 F.3d at 1185 (internal quotes and citations omitted).[9]  "The Supreme Court explained further in Richland Shoe Co. that the word willful is considered synonymous with such words as voluntary, deliberate, and intentional."  Wales v. Jack M. Berry, Inc., 192 F. Supp. 2d 1269, 1291 (M.D. Fla. 1999) (internal citations and quotes omitted).  "For the willfulness issue on which the statute of limitations turns, the burden is on the employee."  Rodriguez v. Farm Stores, 518 F. 3d 1259, 1274 (11th Cir. 2008).

In this case, the question of willfulness turns on whether management knew or should have known that plaintiffs were working off the clock hours for which compensation was due, thus intentionally or voluntarily violating the FLSA.[10]  In their response to Carter's Motion for Summary Judgment, plaintiffs contend that Carter's knew Washington and Harrington worked off the clock to complete all the necessary duties required to run the store properly, and that Cunningham refused to authorize any overtime.  (Doc. 86 at 4).  Plaintiffs also contend that the "archaic" time keeping system did not accurately keep track of the workers' time.  (Doc. 86 at 1-2).  Plaintiffs contend that Carter's knew that Harrington violated company policy

---

[9] For example, an employer willfully violates the FLSA when an employer knows of hourly wage laws, but fails to investigate whether it had complied with those laws. See Davila, 717 F.3d at 1185.

[10] There is no violation of the FLSA where an employee performs uncompensated work but deliberately prevents his or her employer from learning of it.  Allen v. Board of Public Educ. For Bibb County, 495 F.3d 1306, 1319 (11th Cir. 2007).

when she self-reported working off the clock to keep closing associates safe (Doc. 86 at 4), and Washington repeatedly attempted to inform management—namely Cunningham—that the low payroll hours allocated to the store forced off the clock labor.   (Doc. 86 at 5).[11]

No jury could reasonably infer that Cunningham—or any member of management—instructed Washington or Harrington to underreport their hours or work off the clock.   In fact, Harrington testified that the system used to record payroll hours was always "absolutely" accurate, even when the computer system had issues. Doc. 80-6 (Harrington Dep.) at Tr. 91-94.   Both Washington and Harrington clocked themselves in and out and accounted for their own hours worked.   As part of the management team of Store 87, it was Washington and Harrington's duty to make sure all records were accurate including their own; Harrington testified all employee time records were accurate.[12]   Id.   This Court is unwilling to attribute any actual or constructive knowledge to management—including Cunningham—of work being performed off the clock, when plaintiffs' own testimony indicates otherwise. [13]

_____

[11] Jessie Cunningham was never deposed by either side.

[12] There is no record evidence that Carter's discouraged employees at Store 87 from accurately recording overtime work on their timesheets or encouraged employees to falsify their own records which would give rise to a genuine issue of material fact as to accuracy and trustworthiness of Carter's payroll records.   Cf. Allen, 495 F.3d at 1316 (finding the employer's records could not be trusted because employers made employees "take back their accurate time sheets and resubmit new time sheets that reflected their scheduled, not actual, hours" worked).

[13] From the employee earnings record submitted to the Court, Washington earned overtime three of the six pay periods for which she worked.   Doc. 101-3 (Washington Earnings Records).   Furthermore, Harrington took steps to cap her hours and then eventually requested to reduce her hourly rate of pay.   Doc. 60-5 (Gaby Dep.) at Tr. 208, 215.   First, Harrington took an unapproved leave of absence

Neither plaintiff offers any evidence showing that Cunningham forced them to clock out and continue working, or come in early and work before clocking in.[14]   See Gaylord v. Miami-Dade County, 78 F. Supp. 2d 1320, 1325 (S.D. Fla. 1999) ("An employer does not have knowledge of uncompensated overtime when an employee submits time sheets showing such overtime did not occur."); Brumbelow v. Quality Mills, Inc., 462 F.2d 1324, 1327 (5th Cir. 1972) (employee estopped from claiming more hours than those submitted in time sheets).

Throughout the litigation, Harrington has testified that neither she nor Washington ever complained to upper management about working off the clock because working off the clock "was against company policy."   Doc. 79-8 (Harrington Dep.) at Tr. 144.   Moreover, Washington never complained or told anyone that she was working uncompensated overtime hours.   (Doc. 78 at 13).   Plaintiffs concede that both were aware of Carter's timekeeping policy and knew that the company strictly prohibited any off the clock work.   As managers, Washington and Harrington

_____

beginning on October 12, 2008 to intentionally reduce the number of hours she worked in the store.   Id. at Tr. 215.   Once Human Resources learned about the unapproved leave of absence it informed Harrington that she must return to work.   Id. Harrington subsequently requested Carter's reduce her pay from $10.02 to $9 so she could maintain her social security. Id. at Tr. 208.

[14]   The Court distinguishes Cunningham's behavior from that of the immediate supervisors in Brennan v. General Motors Acceptance Corp., 482 F.2d 825 (5th Cir. 1973).   In Brennan, the immediate supervisors pressured employees to "understate[] their overtime," and although the employees "regularly worked in excess of forty hours per week . . . with rare exception, [the employees] were *only allowed* to turn in, record, and be paid for forty to forty-two hours."   Id. at 827-28 (emphasis added).   Further, upper management was aware that employees worked "long and irregular hours" and should have been on notice that the employees reporting no overtime were likely underreporting the number of hours actually worked.   Id. at 828.

were responsible to ensure that Carter's policies—including timekeeping—were followed, not broken.   Do. 90-3 (Harrington Dep.) at Tr. 90-91.   Both were fully aware of the repercussions if this policy was not followed, including their jobs being "in jeopardy."   Doc. 79-8 (Harrington Dep.) at Tr. 144.

Harrington did testify that on one occasion she told Cunningham that she would stay after her scheduled shift to protect associates scheduled to close alone. Harrington believed this was an unsafe practice.[15]   After Harrington self-reported these off the clock hours, Cunningham had Washington—as the store manager and Harrington's direct report—verbally admonish Harrington for violating Carter's timekeeping policy.   On these facts, Cunningham did not need to further inquire as Harrington only reported the violation once, and was disciplined.   Cunningham had no way of knowing that Washington—as the store's manager and Harrington's boss— apparently knew that Harrington's self-report was designed to gain more hours for the store and to stop Harrington and Washington from having to work off the clock.[16] While Cunningham's expectation regarding the number of hours the employees

---

[15]   Harrington testified, "I e-mailed her [Cunningham], and I called her one time and told her I was working off the clock."   Doc. 80-6 (Harrington Dep.) at Tr. 122. Harrington testified she warned Cunningham that "Every time you schedule me to . . . leave at 5:00 and there's only one person closing, I am staying."   Id. at 129.

[16]   "[T]hat was my purpose, was to let them know we needed at least more hours so that we could at least have two people close at night.   That was the purpose of that one."   Doc. 80-6 (Harrington Dep.) at Tr. 159.   But see, Reich . Dept. of Conservation and Natural Resources, 28 F. 3d 1076, 1083-84 (11th Cir. 1994) (holding that when an employer knows that supervisors were not closely monitoring employees' total number of hours worked, knowledge will be imputed to the employer).   The facts here can be distinguished from those in Reich, because Cunningham had no way of knowing that Washington was not closely monitoring her store's time records.   Instead, she too was apparently hiding the fact she worked off the clock.

needed to work to get the job done might have been unreasonable, this does not mean she willfully violated the FLSA.   Cunningham took care of the only reported timekeeping violation by instructing Harrington's boss, Washington, to carry out the discipline in accordance with Carter's policy.

Furthermore, Washington's complaints about payroll hours would not have imputed knowledge to Cunningham that the FLSA was being violated.   Just because the FLSA is "in the picture" does not mean the violation is willful; that would "virtually obliterate any distinction between willful and nonwillful violations.   Hazen Paper Co. v. Biggins, 507 U.S. 604, 614 (1993) (internal citation omitted).   Carter's Regional Vice President, Annette Metzger, testified that store managers—like Washington— can adjust their payroll based on the current trend of their volume of customers.   Doc. 65-13 (Metzger Dep.) at Tr. 37.   Metzger further testified that store managers could increase payroll hours if "they're following the payroll budget, and their sales meet the level that they are at for the hours that are allocated, they . . . [can adjust the hours] on their own."   Id.   There's no need to get "approval."   Id.   Even Harrington, testified that "things started to change a little when . . .   [Washington] left . . . [i]n other words, they started giving more hours" under a new store manager.   Doc. 80-6 (Harrington Dep.) at Tr. 16.

A jury would not be authorized to conclude that Carter's willfully violated the FLSA with reckless disregard because there is no evidence of voluntary, deliberate, or intentional conduct by Carter's.   Carter's has established that it made adequate inquiry into both Washington and Harrington's conduct once Harrington's allegations

of off the clock work surfaced.   Carter's verbally disciplined Harrington and terminated Washington for failing to comply with Carter's timekeeping policies prohibiting off the clock work.

Because plaintiffs have failed to produce evidence from which a jury could infer Carter's willfully violated the FLSA, the default two-year limitations period governs plaintiffs' claims.   29 U.S.C. § 255(a).   As plaintiffs filed their claims more than two years after the date they received their final paychecks from which they would have had unpaid compensation due, their FLSA overtime pay claims are time-barred.

## IV.   RETALIATION CLAIM

Washington asserts that she engaged in protected activity by complaining to Carter's about not being paid overtime wages.   Washington maintains Carter's terminated her for complaining about being forced to work off the clock without compensation.   Washington asserts that is a non-legitimate, retaliatory reason for termination.

The FLSA's retaliation provision makes it unlawful "to discharge . . . any employee because such employee has filed any complaint . . . ."   29 U.S.C. § 215(a)(3). "The requirement that a complaint be 'filed' is intended to provide the employer with 'fair notice' that an employee 'is in fact making a complaint about an Act violation,' rather than 'just letting off steam.'" <u>Morse v. JP Morgan Chase & Co.</u>, June 23, 2011, Whittemore, J. 8:11-CV-779-T-27EAJ (quoting <u>Kasten v. Saint Gobain Performance Plastics Corp.</u>, 131 S. Ct. 1325, 1334 (2011)).   "'Filing is a serious occasion, rather than a triviality.   As such, the phrase, 'filed any complaint' contemplates some degree

of formality certainly to the point where the recipient has been given fair notice that a grievance has been lodged . . . .” <u>Kasten</u>, 131 S. Ct. at 1334 (2011).

Although the statutory requirements may be satisfied by an "informal workplace grievance procedure," the record does not show that Washington ever made anything close to a serious complaint to Carter's.   In fact, Washington never complained to anyone at all about working off the clock, except to Harrington. Washington only ever voiced concerns about needing more payroll hours to run the store adequately.   Doc. 90-3 (Harrington Dep.) at Tr. 147.   Harrington testified that she had personal knowledge that Washington never complained to any manager that any employee in Store 87 was working over 40 hours a week without compensation. Doc. 90-3 (Harrington Dep.) at Tr. 149.   Carter's suspended and subsequently terminated Washington after discovering that she was violating the timekeeping policy by not clocking in and out when she was at work.   As the store manager, Washington was familiar with the timekeeping policy and was aware that a violation could result in discipline including termination.   There is no evidence to suggest Washington complained about off the clock hours or that Carter's terminated her based on any such complaints.   This Court finds Washington's complaint falls short of any protected activity under 29 U.S.C. § 215(a)(3).

## V.      WASHINGTON'S FMLA CLAIM

Although Washington's complaint includes an FMLA claim, Carter's contends Washington has abandoned the claim by virtue of her having failed to mention it in her briefs.   (Doc. 89).

Failure to brief and argue the issue during proceedings before the district court is grounds for a finding that the issue has been abandoned. Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta, 219 F.3d 1301, 1326 (11th Cir. 2000). "'[T]he onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.'" Coalition, 219 F.3d at 1326 (quoting Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995)). See also Road Sprinkler Fitters Local Union No. 669 v. Independent Sprinkler Corp., 10 F.3d 1563, 1568 (11th Cir. 1994) (a ground not pressed in the district court in opposition to a motion for summary judgment is to be treated by the district court as abandoned). "In opposing a motion for summary judgment, 'a party may not rely on his pleadings to avoid judgment against him.'" Resolution Trust Corp. v. Dunmar Corp., 43 F.3d at 599. Nor may a party file evidence and expect the district court to sift through that evidence unguided by citation to factual support and legal authority. The district court has no obligation to "distill every potential argument that could be made based upon the materials before it on summary judgment." Resolution Trust Corp., 43 F.3d at 599. "Presenting such arguments in opposition to a motion for summary judgment is the responsibility of the non-moving party, not the court." Blue Cross and Blue Shield of Ala. v. Weitz, 913 F.3d 1544 (11th Cir. 1990).

In Washington's Response to Defendant's Motion for Summary Judgment, Washington failed to defend the FMLA claim. (Doc. 86). In Carter's Reply brief, Carter's argues that because Washington did not mention the FMLA "claim, its

elements, or why the claim should survive summary judgment" the "Plaintiff's omission must be deemed abandonment of the claim." (Doc. 89 at 8 n.13). In the sur-reply, Washington does not deny that the claim has been abandoned, and never once mentions the FMLA. Beyond the absence of the FMLA claim in plaintiffs' briefs, at the hearing on June 2, 2014, plaintiffs' counsel candidly told this Court that the crux of the case related to the FLSA, not the FMLA.[17]

Because the FMLA claim alleged in the complaint was not raised during opposition to the motion for summary judgment, the Court deems it abandoned.

## VI.   RULE 11 SANCTIONS

Carter's filed a motion under Rule 11 seeking sanctions for plaintiffs' filing and maintaining factually baseless claims. (Doc. 91). Plaintiffs are now represented by court appointed, pro bono counsel after the Supreme Court of Florida suspended plaintiffs' former counsel who brought the suit. Moreover, while unmeritorious, plaintiffs' claims were not so deficient that Rule 11 sanctions are appropriate. In light of these circumstances, the Court declines to sanction plaintiffs.

---

[17] The Court appointed plaintiffs' current counsel after plaintiffs' original counsel was suspended from the practice of law. It was plaintiffs' original counsel who filed the complaint one day after the FLSA limitations period had passed. It was also plaintiffs' original counsel who brought but then did not pursue the FMLA claim. At the hearing plaintiffs' current counsel told the Court that he did not have the client's consent to abandon the FMLA claim.

Accordingly, it is hereby

**ORDERED:**

1. Carter's Motion for Summary Judgment as to the Estate of Bridget Washington (Doc. 79) is **GRANTED** as to Counts I, II, and III.

2. Carter's Motion for Summary Judgment as to Catherine Harrington on Count I (Doc. 80) is **GRANTED**.

3. Carter's Motion for Rule 11 Sanctions (Doc. 91) is **DENIED**.

4. The Clerk should enter judgment in favor of Carter's Retail, Inc. and against the Estate of Bridget Washington, Robert Lewis Washington, Jr. as the Estate's Personal Representative, and Catherine Harrington.

5. The Clerk is directed to close this case.

6. The Court appreciates the service of court-appointed counsel.

**DONE AND ORDERED** at Jacksonville, Florida this 18th day of November, 2014.

TIMOTHY J. CORRIGAN
United States District Judge

cg.
Copies to:
Counsel of record